[Civ. No. 14643. Third Dist. Mar. 16, 1977.]

Adoption of REBECCA B., a Minor.
DANIEL B., Plaintiff and Respondent, v.
MILTON W., Defendant and Appellant.

194

COUNSEL

Roger E. Hughes for Defendant and Appellant.

Monte E. McFadden for Plaintiff and Respondent.

OPINION

**PUGLIA, P. J.**—Daniel B. timely initiated a proceeding in the superior court to vacate and set aside a decree of adoption (Civ. Code, § 227d)[1] by which the petition of Milton W. (stepfather) for adoption of Rebecca B. had been granted. Stepfather appeals from the judgment of the superior court vacating and setting aside the adoption.

Rebecca was born June 29, 1972. Her mother and Daniel B., her natural father, were not then married nor does it appear that they have ever married. Stepfather married Rebecca's mother August 31, 1973. Thereafter he filed his petition for adoption alleging that Rebecca's mother retains all her rights to custody and control of the child. The probation officer's report (§ 227a) related that Rebecca had resided with her mother and stepfather since their marriage and was receiving good care. The probation officer recommended in favor of the adoption. The trial court granted the decree, finding that under the provisions of the Civil Code, the consent to adoption of Rebecca's mother alone was required.

 It does not appear from the abbreviated record before us that Daniel ever legitimated Rebecca (former §§ 215, 230).[2] Daniel did file a complaint on June 28, 1973, alleging that he is Rebecca's natural father and seeking to establish his parental relationship (former § 231; see now § 7006, subd. (c)). The complaint constitutes a public acknowledgement of the parental relationship, but even such an action successfully concluded falls far short of accomplishing legitimation. (*Adoption of Pierce* (1971) 15 Cal.App.3d 244, 248-249 [93 Cal.Rptr. 171], disapproved on other grounds in *In re Richard M.* (1975) 14 Cal.3d 783, 798 [122 Cal.Rptr. 531, 537 P.2d 363].)

---

[1]All subsequent section references are to the Civil Code unless otherwise indicated.

[2]Similarly, nothing in the record suggests that Daniel would qualify as Rebecca's presumed father under current law (see § 7004, subd. (a)).

At the time of the proceedings in the trial court "The mother of an illegitimate unmarried minor [was] entitled to its custody, services, and earnings." (Former § 200; see now § 197.) Section 224 then provided that "A legitimate child cannot be adopted without the consent of its parents if living; . . . nor an illegitimate child without the consent of its mother if living; . . ."[3]

In the proceeding to vacate the adoption decree Daniel averred that he had not received notice of the adoption proceedings; that he had not been afforded a hearing as to his rights with reference to Rebecca; and that he had not consented to her adoption. In awarding judgment in favor of Daniel, the trial court cited and relied upon *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208].

■ Prior to the decision in *Stanley* v. *Illinois, supra,* the father of an illegitimate child enjoyed no unconditional rights in the child. (*Cheryl H.* v. *Superior Court* (1974) 41 Cal.App.3d 273, 277 [115 Cal.Rptr. 849].) In *Stanley,* the court held violative of equal protection and due process rights an Illinois statute which, upon the death of an unwed mother, made her children wards of the state without according to the father the right to be heard. The father in that case had physical custody of the children when the mother died. Nonetheless, in analyzing the *Stanley* decision, our state Supreme Court observed that "the court purported to go beyond the precise facts of that case and held that the state was required to afford a hearing to all unwed fathers who desire and claim that they are fit to care for their children *when the mother cannot or will not provide that care.* ([*Stanley* v. *Illinois*], at p. 657, fn. 9 [31 L.Ed.2d at p. 562]; see also *State* v. *Lutheran Soc. Serv. of Wis. & Upper Mich.* (1970) 47 Wis.2d 420 [178 N.W.2d 56]; vacated *sub nom. Rothstein* v. *Lutheran Social Services* (1972) 405 U.S. 1051 [31 L.Ed.2d 786, 92 S.Ct. 1488]; Rich, *Plight of the Putative Father in California Child Custody Proceedings: A Problem of Equal Protection* (1973) 6 U.C. Davis L.Rev. 1, 2-3.) The court premised its holding on 'rights to conceive and to raise one's children,' and held that such rights could not be taken from a father of a child born to a woman to whom he was not wed by operation of a statutory presumption of the father's unfitness. [¶] In broad terms *Stanley* states that the interest of an unwed father in his children is not only cognizable but also of sufficient substance to warrant deference

---

[3]Section 224 has since been rewritten to remove all references to legitimate and illegitimate children. The section as amended (Stats. 1975, ch. 1244, § 7) requires the consent to adoption of the mother alone in cases where the child has no presumed father under subdivision (a) of section 7004. (See fn. 2, *ante,* p. 195.)

except when the deprivation comports with equal protection and due process requirements." (Fn. omitted; italics added; *In re Lisa R.* (1975) 13 Cal.3d 636, 647-648 [119 Cal.Rptr. 475, 532 P.2d 123].)

We are unaware of any decided case extending the benefit of the *Stanley* rule to the putative father where, as here, the natural mother retains custody and control of the child. In *In re Lisa R., supra,* 13 Cal.3d 636, the standing of the putative father to assert his custodial rights was recognized where the mother and the statutorily presumed father, to whom she was married when the child was born, were both deceased. (At p. 651.) In *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d 273, the court acknowledged the right of a putative father to be heard in any proceeding to change legal custody of the child *after* the natural mother had first surrendered her rights in the child to an adoption agency (at pp. 279-280). In *In re Reyna* (1976) 55 Cal.App.3d 288 [126 Cal.Rptr. 138], the court (applying § 4600) recognized the right of a putative father to seek custody of the child from an adoption agency to which the mother had previously relinquished the child for adoption (at p. 297). Factually similar to *Reyna* are *State* ex rel. *Lewis* v. *Lutheran Social Services of Wis. & Upper Mich.* (1970) 47 Wis.2d 420 [178 N.W.2d 56], vacated and remanded *sub nom. Rothstein* v. *Lutheran Social Services of Wisconsin and Upper Michigan* (1972) 405 U.S. 1051 [31 L.Ed.2d 786, 92 S.Ct. 1488], and *People* ex rel. *Slaweck* v. *Covenant Children's Home* (1972) 52 Ill.2d 20 [284 N.E.2d 291]. In *Vanderlaan* v. *Vanderlaan* ((1970) 126 Ill.App.2d 410 [262 N.E.2d 717], vacated and remanded (1972) 405 U.S. 1051 [31 L.Ed.2d 787, 92 S.Ct. 1488]), custody of the children had been surrendered voluntarily to the natural father by the mother.

The instant factual situation is readily distinguishable. Here the natural mother has not relinquished her rights in the child. To the contrary, as in the typical stepparent adoption, one natural parent retains custody and control (see §§ 226, 226.9, 227a) even though consenting to the adoption. We must decide whether in these circumstances the provision of section 224 prior to its amendment (see fn. 3, *ante,* p. 196, and text thereat) requiring the consent of the mother alone to the adoption of an illegitimate child is consonant with the constitutional doctrine announced in the *Stanley* case. Weighing the competing private and state interests involved (*In re Lisa R., supra,* 13 Cal.3d at p. 648), we conclude that it is.

By implication, Daniel claims the right, by withholding his consent, to thwart the adoption of Rebecca by her stepfather. For all the record

discloses, his interest in the child derives from the fact of their biological relationship alone. It does not appear that he has ever married or attempted to marry Rebecca's mother, or that he has ever cohabited with her; neither does it appear that he has ever contributed to the support of the child or that he has ever had custody of her or received her into his family (see former § 230).

To invest the putative father with the power to thwart an adoption in the instant circumstances would run counter to the policy of the law favoring legitimation (see *Adoption of Graham* (1962) 58 Cal.2d 899, 904 [27 Cal.Rptr. 163, 377 P.2d 275]; *Adoption of Irby* (1964) 226 Cal.App.2d 238, 240 [37 Cal.Rptr. 879]). An adoption itself accomplishes legitimation (§ 228). Frustration of the adoption for lack of the natural father's consent, while preventing legitimation by adoption, would not assure legitimation by the natural father. (See former § 230; cf. § 7004, subds. (a)(3) and (4).)

It is settled that the consent of Rebecca's mother is not a legal prerequisite to Daniel's receiving the child into his family. (Former § 230; *In re Richard M., supra,* 14 Cal.3d at p. 796; cf. § 7004, subd. (a)(4).) However, lack of consent and cooperation by Rebecca's mother, in whose sole custody and control she remains, may well have imposed an insuperable practical obstacle to Rebecca's legitimation. (Cf. *In re Reyna, supra,* 55 Cal.App.3d at p. 301.) Thus, to have required the consent of the natural father to accomplish an adoption such as this could have had the unfortunate effect of suspending the child, perhaps indefinitely, in the status of illegitimate, with its attendant stigma and unfavorable legal treatment. (Cf. *In re Richard M., supra,* 14 Cal.3d at p. 798.)[4]

The state also has "a legitimate interest in promoting marriage, and in furtherance of that policy of not impugning a family unit." (*In re Lisa R., supra,* 13 Cal.3d at p. 650; see *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657].) The only family unit to which Rebecca

[4]Under the Uniform Parentage Act (§ 7000 et seq.; Stats. 1975, ch. 1244, § 11, eff. Jan. 1, 1976), a man not the presumed father of a child under section 7004, subdivision (a), but alleging himself to be the father, may bring an action to determine the existence of the father and child relationship (§ 7006, subd. (c)). The resulting judgment or order of court may make provision for any matter in the best interests of the child including support, custody, guardianship and visitation privileges (§ 7010, subd. (c)). Thus the judgment may provide the opportunity for the alleged natural father to qualify as the presumed father under section 7004, subdivision (a)(4). Section 7017 spells out the rights of a presumed father with respect to a child in the situation where the mother "relinquishes or consents to or proposes to relinquish [the child] for adoption . . . ."

has belonged is that provided by the marriage of her mother and stepfather. The tenuous nature of Daniel's interest in Rebecca does not justify extending to him the power to prevent this adoption with the consequent denial to Rebecca of the benefits of a legally secure and normal family relationship and the resulting stresses upon the marriage itself which may well occur.

It has been held that section 224 as applied in a closely analogous factual context "is in accord with the interests of children in need of adoption and is necessary to further the state's compelling interest in making adoptions possible in proper cases." (*Adoption of Ahmed* (1975) 44 Cal.App.3d 810, 814 [118 Cal.Rptr. 853].)

Accordingly, we hold that the balance of competing interests between the state and the putative father justifies the provision for stepparent adoption of an illegitimate child on the basis of the consent of the mother alone who retains custody and control of the child.

■ We decide next whether the constitutional principle announced in *Stanley* requires that Daniel should have been given notice of the adoption proceedings and the right to be heard therein. Since, as we have decided, the natural father's lack of consent to the adoption is totally immaterial, and the natural mother, vis-a-vis the natural father, is entitled to custody and control of the child (former § 200; see now § 197; see fn. 2, *ante,* p. 195) and will remain so after the adoption, the right to notice and hearing would serve no purpose unless there remains in the natural father some substantial inchoate right in the child of which he cannot be deprived without due process.

We conclude that there inhere in the natural father certain residual rights in the child which cannot be terminated by adoption (see § 229) without notice and the opportunity to be heard. Until the child is adopted, the natural father of an illegitimate child is a parent within the meaning of section 4600 (*In re Reyna, supra,* 55 Cal.App.3d at p. 297). As against the mother who retains custody and control, he has no right to custody. But if for any reason the adoption proceedings are abandoned (e.g., withdrawal of consent, § 226a; withdrawal of petition, § 226b), or the petition is denied, the natural father retains the custodial preference accorded a parent by section 4600. That preference may ripen into a right in the event of changed circumstances. The death of the mother pending finality of the adoption proceedings (see *Adoption of Bird* (1960) 183 Cal.App.2d 140, 147 [6 Cal.Rptr. 675]; § 227d), the denial of the petition for the existence of the conditions constituting grounds for a

proceeding under section 300, subdivision (d), of the Welfare and Institutions Code (former § 600, subd. (d)),[5] or the abandonment of the stepparent adoption and subsequent relinquishment of the child to an adoption agency by the mother (§ 224m), all constitute changes of circumstance which could lead to the acquisition of custody by the natural father. Accordingly, the natural father is entitled to notice of the adoption proceedings and the right to be heard on those limited matters affecting his contingent interests.

The judgment is affirmed.

Regan, J., and Evans, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 12, 1977.

---

[5]Section 300, subdivision (d), of the Welfare and Institutions Code provides as follows: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court: . . . [¶] (d) Whose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents, or of his guardian or other person in whose custody or care he is."